UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE THIEME,<br><br>          Plaintiff,<br><br>    v.<br><br>DIANE M. COBB, et al.,<br><br>          Defendants. | Case No.  13-cv-03827-MEJ<br><br>**ORDER RE: DEFENDANT VANDYK MORTGAGE CORPORATION'S MOTIONS FOR SUMMARY JUDGMENT** |
| CYNTHIA CHENAULT,<br><br>          Plaintiff,<br><br>    v.<br><br>DIANE M. COBB, et al.,<br><br>          Defendants. | Case No.  13-cv-03828-MEJ |
| LEWIS HAYNES,<br><br>          Plaintiff,<br><br>    v.<br><br>DIANE E. COBB, et al.,<br><br>          Defendants. | Case No.  15-cv-02455-MEJ |

**INTRODUCTION**

Defendants Diane Cobb and Paul Sloane Davis pleaded guilty to several counts of mail and wire fraud, and conspiracy to commit mail and wire fraud.  In their plea agreement, they admitted to defrauding a number of investors by offering them the opportunity to fund short-term "bridge loans" to other borrowers who allegedly needed short term financing in connection with real estate transactions (the "Scheme").  The bridge loans were fictitious and part of a Ponzi scheme:  Cobb and Davis used new investors' monies to pay "interest" to the older investors.

1   Cobb and Davis were sentenced to prison terms and ordered to pay restitution to their victims.

2       Plaintiffs Steve Thieme, Cynthia Chenault, and Lewis Haynes (collectively, "Plaintiffs")

3   were among the investors who were defrauded by Cobb and Davis.  Each filed suit against Cobb,

4   Davis, and VanDyk Mortgage Corporation ("VanDyk").[1]  The undersigned related the three

5   actions.  With respect to VanDyk, Plaintiffs only assert a claim for negligence and a claim under

6   California's Unfair Competition Laws ("UCL"), California Business and Professions Code

7   sections 17200 and 17500 et seq.(together, "UCL").  *See* Third Am. Compl., Thieme Dkt. No.

8   161.[2]  Pending before the Court are VanDyk's Motions for Summary Judgment, or in the

9   alternative, Partial Summary Judgment.  *See* Thieme Mot., Thieme Dkt. No. 167; Chenault Mot.,

10  Chenault Dkt. No. 137; Haynes Mot., Haynes Dkt. No. 73.  Plaintiff filed a Consolidated

11  Opposition to the Motions (Thieme Dkt. No. 186[3]) and Defendant filed a Consolidated Reply

12  (e.g., Thieme Dkt. No. 194).

13      The Court previously found these Motions suitable for disposition without oral argument

14  and vacated the January 19, 2017 hearing.  *See* Order Vacating Hr'g, Thieme Dkt. No. 199.

15  Having considered the parties' positions, relevant legal authority, and the record in this case, the

16  Court **GRANTS** VanDyk's Motions for the following reasons.

17                          **EVIDENTIARY ISSUES**

18      VanDyk asks the Court to take judicial notice of the plea agreements Cobb and Davis

19  made in the criminal proceedings relating to the Scheme, the judgments entered in the criminal

20  proceedings, and the operative complaint in each of the three related matters.  *See* VanDyk RJN,

21  Thieme Dkt. No. 169.  The Court may take judicial notice of the facts contained in Cobb and

22  _____

23  [1] Thieme and Chenault filed their complaints in California Superior Court; VanDyk removed the
    actions to this court on the basis of diversity jurisdiction.  Not. of Removal, Thieme Dkt. No. 1,
24  Chenault Dkt. No. 1.  Haynes filed his complaint directly in this court.  Compl., Haynes Dkt. No.
    1.  A number of other defrauded investors also sued Cobb and Davis.

25  [2] The three Plaintiffs are represented by the same counsel, and the operative complaints are
26  materially identical but for details specific to each Plaintiff's investments.

27  [3] Plaintiffs only filed their Opposition in the *Thieme* matter, but the Court construes the
    Opposition as it is intended to apply in all three related matters.  Throughout this Order, citations
28  to "Thieme Dkt." refer to documents filed in Case No. 13-3827, "Chenault Dkt." to documents
    filed in Case No. 13-3828, and "Haynes Dkt." to documents filed in Case No. 15-2455.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Davis' plea agreements and the criminal judgments. *See* Fed. R. Evid. 201.  The Court need not

2   take judicial notice of the operative pleadings in these matters; they are already part of the record.

3          Plaintiffs ask the Court to take judicial notice of dozens of statutes, regulations, and

4   policies. *See* Exs. A-S, X of Pls.' RJN, Thieme Dkt. No. 180.  Any adjudicative facts in these

5   documents are judicially noticeable pursuant to Rule 201 and/or Rule 1005.  Plaintiffs also request

6   the Court take judicial notice of VanDyk's responses to Special Interrogatories "in the above-titled

7   case." *See id*. at 10 (addressing Exs. T, U, V and W to Pls.' RJN).[4]  Plaintiff asks the Court to take

8   judicial notice of these four sets of discovery responses pursuant to the California Evidence Code,

9   which is not the relevant legal authority in federal court.  The Court declines to take judicial notice

10  of Exhibits T, U, V, and W, as Plaintiff has not established these documents contain adjudicative

11  facts of which this Court may take judicial notice pursuant to the Federal Rules of Evidence. *See*

12  Fed. R. Evid. 201.

13         Plaintiffs refer to approximately 60 exhibits in their Opposition. *See* Consol. Evid. of

14  [Plaintiffs] in Supp. of Opp'n to Stmt. of Undisputed Facts ("Pls.' Consol. Evid."), Thieme Dkt.

15  No. 188.  VanDyk's evidentiary objections to these exhibits (Evid. Obj., Thieme Dkt. No. 196) are

16  not contained within its Reply, and therefore violate Civil Local Rule 7-3(c).  The Court overrules

17  VanDyk's separately-filed objections on that basis. *See Hennigan v. Insphere Ins. Sols., Inc*., 38

18  F. Supp. 3d 1083, 1094-95 (N.D. Cal. 2014) (striking separately filed evidentiary objections for

19  failure to comply with Civil Local Rule 7-3(a) and (c)); *Beauperthuy v. 24 Hour Fitness USA,*

20  *Inc*., 772 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (denying parties' separately-filed motions to

21  strike evidence on ground that they violate Civil Local Rule 7-3(b) and (c), and characterizing

22  motions as "attempt[s] to evade the briefing page limits").  Moreover, many of VanDyk's

23  objections are based on lack of relevance, but "'objections to evidence on the ground that it is

24  irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion

25  are all duplicative of the summary judgment standard itself' and are unnecessary." *Smith v. Cty. of*

26

27  _____

28  [4] In fact, Exhibits T, V, and W are excerpts of discovery responses VanDyk served on different plaintiffs in different cases, not in any of the three related cases to which the instant Motions relate.

*Santa Clara*, 2016 WL 4076193, at *8 (N.D. Cal. Aug. 1, 2016), *appeal dismissed* (Sept. 30, 2016) (citing *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).  "A court can award summary judgment only when there is no genuine dispute of material fact.  It cannot rely on irrelevant facts, and thus relevance objections are redundant."  *Burch*, 433 F. Supp. 2d at 1119.

## MATERIAL FACTS[5]

### A.   VanDyk, Cobb, Davis, and DM Financial

VanDyk is a lender that is primarily in the business of lending money to first and second mortgage borrowers.  It is licensed in 37 states and has approximately 90 licensed branches.  VanDyk did not offer bridge loans as a specific product to its client.  Thieme UMF 11, 15; Pls.' Opp'n to UMF 15.

Beginning in approximately 2001 and continuing through approximately 2012, Cobb and Davis owned and operated a lending and financial services company known as DM Financial.  In 2007, Cobb contacted VanDyk and expressed interest in joining the company.  VanDyk employee Corey Hill followed up with Cobb on her inquiry.  Hill conducted a criminal background check of Cobb, and it did not show anything.  Hill Googled Cobb's background and found "[n]othing that drew a red flag."  Thieme UMF No. 9.  Hill also conducted a credit check, which indicated Cobb was a "High Risk Fraud Alert" because several tax liens had been recorded against her, she had multiple adverse public records, serious delinquencies, high balances on revolving accounts, and several collection activities.  Pls.' Opp'n to UMF 8; VanDyk Reply UMF 8.  Cobb's credit history was acceptable to VanDyk.  Hill hired Cobb in September 2007 as a branch manager, loan officer,

---

[5] VanDyk filed Separate Statements of Undisputed Material Facts ("UMF") in each of the three related cases ("Thieme UMF", Thieme Dkt. No. 168; "Chenault UMF", Chenault Dkt. No. 141; "Haynes UMF", Haynes Dkt. No. 74).  Pursuant to this Court's request to streamline the briefing in these matters, Plaintiffs filed a consolidated Opposition to VanDyk's Separate Statements ("Pls.' Opp'n to UMF"), and also consolidated additional facts ("Pls.' Suppl.").  *See* Thieme Dkt. No. 187.  Pls.' Suppl. UMF are organized into several sections; unless the Court specifies otherwise, it refers to the first section, which is found at pages 1-26.  VanDyk then filed a consolidated Reply Separate Statement responding to Plaintiffs' additional facts ("VanDyk Reply UMF", e.g., Thieme Dkt. No. 195).  VanDyk also filed Evidence in Support of its Motion.  *See, e.g.*, Thieme Dkt. No. 171 ("VanDyk Evid.").  Plaintiffs did as well.  *See* Pls.' Consol. Evid., Thieme Dkt. No. 188.

United States District Court
Northern District of California

1    outside sales representative, and loan processor for a new branch office in Mill Valley, California.

2    Between August 2009 and August 2011, Cobb worked for VanDyk in California; she transferred

3    to VanDyk's Las Vegas branch in October 2011, and worked there until she resigned in December

4    2012.  Davis was never an employee of VanDyk; he continued to work at DM Financial through

5    2012 out of the same office in which VanDyk subleased space from Cobb.

6         At all relevant times during her association with VanDyk, Cobb was prohibited from

7    engaging in outside employment in real estate, banking, and related fields.  Accordingly, when

8    Cobb joined VanDyk, Hill expected her to resign her duties at DM Financial; however, Hill did

9    not confirm that Cobb in fact did so.  Cobb testified that no one told her DM Financial was

10   supposed to go out of business when she worked for VanDyk.  Cobb Dep. Vol. 2 at 86:14-17 (Q:

11   "No one at VanDyk told you to discontinue your operations as D.M. Financial did they?" A:

12   "No"), Pls.' Consol. Evid. Ex. 1.  She also testified that upon reviewing her VanDyk contract, she

13   asked Hill, "[W]hat does this mean?  And I says I can't give up DM Financial.  And he said don't

14   worry about it."  *Id*. at 119:12-22 (errors in original).  After she became an employee of VanDyk,

15   Cobb testified she attended a dinner with VanDyk management, including VanDyk's President,

16   Thomas VanDyk, and told them DM Financial was "doing some real estate.  Because we were

17   intending to buy and fix houses up.  But he, they knew that D.M. Financial still existed."  *Id*. at

18   107:17-109:11; *see also id*. at 118:11-17 (Cobb never sought written permission from VanDyk

19   president to continue DM Financial because she was twice told "by Mr. VanDyk that I didn't need

20   to worry about it."); 124:9-125:21 ("I reiterated the fact that DM Financial still existed and that I

21   was going to be working on real estate deals.  And I wanted to let that again come out . . .  I

22   brought it up because I knew that was in part of the contract.  And I didn't want to be in trouble

23   about it."  According to Cobb, VanDyk simply wished her "good luck" with her endeavor).

24        Cobb never told anyone at VanDyk that she was making bridge loans through DM

25   Financial, but she testified VanDyk "could have known" because some of the bridge loans she

26   made were documented in subsequent mortgage applications customers submitted to VanDyk, and

27   were identified as DM Financial products.  *Id*. at 110:2-19 ("When we would do purchase loans

28   for a client that needed a bridge loan and it got a bridge loan from us, we had to show them the

documentation of the bridge loan."  Q: "Who is them?"  A: "Underwriting, VanDyk Mortgage.")

James Beebe, Chief Counsel and Compliance Officer of VanDyk, testified that "every single loan

that was submitted was looked at, scrutinized, every single loan she submitted."  Pls.' Consol.

Evid., Ex. 27 at 57:17-20.

None of the loans Cobb originated at DM Financial followed her to VanDyk.  Thieme

UMF 12 ("Any loan that had an application taken on it would have to be closed out at the previous

company.  The only loans VanDyk will do for any of our branches are loans that are originated

after their time of employment with us.").  Many of DM Financial's customers requested bridge

loans because they were relocating and/or buying another property.  Thieme UMF 6.

In addition to Cobb and Davis, Cobb's step-son Anthony ("Tony") Cobb also worked at

DM Financial.

**B.      Evidence That VanDyk and DM Financial Are Alter Egos**

"In most cases when [VanDyk] brought a branch manager aboard, they were already in an

existing location and they had to slowly transfer things over into VanDyk's name.  Whether it be

the phone system, the internet connection, UPS, rolled into VanDyk's name."  Pls.' Hill Dep. at

83:17-84:23, Pls.' Consol. Evid. Ex. 6.  Thus, when Cobb joined VanDyk in September 2007 and

until January of the following year, there was "some spillover in the use" of DM Financial

equipment before the "VanDyk system [was] up and operating."  *Id*.  DM Financial and VanDyk

eventually used separate phone lines.  Cobb Dep. Vol. 1 at 82:9-83:22, Pls.' Consol. Evid. Ex. 1.

Both Cobb and Tony Cobb continued to use @dmfinloans.cs.com email addresses to conduct DM

Financial business after joining VanDyk.  Pls.' Hill Dep. at 91:15-92:15.  Hill was aware of this

because he received some emails from Tony Cobb from that address; however, Hill was not

concerned because "a lot of our employees had kept an old email address open in case any of those

old [clients] reached out to them via" that old email address.  *Id*.

Regulations promulgated by the U.S. Government Department of Housing and Urban

Development ("HUD") prohibited VanDyk branches from sharing an office with any non-VanDyk

entity.  First Sundstrom Dep. at 57, Pls.' Consol. Evid. Ex. 22 (VanDyk would "immediately" stop

doing business if it discovered improper office sharing).  VanDyk subleased a portion of DM

United States District Court
Northern District of California

United States District Court
Northern District of California

Financial's office space from DM Financial beginning in October 2007 and signed another sublease in February 2008. *See* Pls.' Consol. Evid. Ex. 2 at pp. 1, 5, 15-16, 32; *see also* Pls.' Hill Dep. at 111:11-115:6, 123:10-25. When VanDyk opened up the new Mill Valley branch, VanDyk had to register the location with HUD. Beebe Dep. at 45:1-6, Pls.' Consol. Evid. Ex. 27. Normally, if VanDyk "tr[ies] to register a location that already is registered as a mortgage lending location or mortgage broker, whatever, HUD won't allow it." *Id*. HUD allowed VanDyk to register the Mill Valley branch even though DM Financial already was operating out of that address. DM Financial did not have licenses issued in its name; Cobb herself did not obtain a license until she joined VanDyk in 2007. Cobb Dep. Vol. 1 at 48:16-25, 63:9-12.

In June 2010, VanDyk inspected the Larkspur branch office from which Cobb was operating at the time. Pls.' Consol. Evid. Ex. 11. The Larkspur branch office is identified as Branch 307. *Id*. A picture attached to the VanDyk inspection report shows a sign on the door listing both DM Financial and VanDyk. *Id*. at p.152; *see also* Cobb Dep. Vol. 1 at 61:11-13. In January 2011, a VanDyk employee circulated an email identifying several VanDyk offices that were "red flagged" for possible improper office sharing, including Branch "307". Pls.' Consol. Evid. Ex. 7. Cobb was not aware that VanDyk investigated her branch for improper office sharing. *See* Cobb Dep. Vol. 1 at 114:19-23 (Cobb never received any communication from VanDyk re the inspection). There also is no record that anyone at VanDyk inspected any of the other locations from which Cobb worked, despite VanDyk policies requiring office inspections every three years or any time a branch relocated. Pls.' Consol. Evid. Ex. 28 at p. 441; *id*., Ex. 29 at p. 242.

Tony Cobb testified he worked as Davis and Cobb's assistant at DM Financial, but after Cobb started working with VanDyk, "my focus and what I did was processing loans that were going to VanDyk Mortgage once we started with VanDyk Company." T. Cobb Dep. at 39:9-15, Pls.' Consol. Evid. Ex. 49. For some time, he received two paychecks: one from VanDyk and one from DM Financial. *Id*. at 40:1-14. Tony Cobb testified that Cobb was cutting him a check from DM Financial for being an assistant, "but I was processing loans for VanDyk mortgage." *Id*. at 41:1-7; *see also id*. at 66:14-25 (testifying he was not sure why he received two checks, but knew

"there was only so much that VanDyk would allow to pay a processor by the hour, and so, essentially, the gaps – to bridge the gap, [he] would get a check from DM Financial."); *id*. at 67:1-7 (he was not "really doing anything for DM Financial.  More doing something for Diane, my stepmom, and/or Sloane, as an assistant.").  Tony did not know what happened to Cobb's book of business when she joined VanDyk.  *Id*. at 45:21-24.  He did not believe he had a copy of that book of business; before Cobb joined VanDyk, he had produced a mailer "from time to time" for DM Financial using that client list to "see if we could find someone who needed a loan," but he "never" did so for VanDyk.  *Id*. at 46:3-19.  Tony also recalled the house where he and Cobb worked at 720 Tamalpais in Mill Valley had two lines: one for DM Financial, and one for VanDyk.  *Id*. at 58:12-24; *see also* Cobb Dep. Vol. 1 at 45:18-23 (always had a separate number for DM Financial).  After Cobb joined VanDyk, Cobb's husband, Richard Cobb, also was hired.  Pls.' Suppl. UMF 66.

Hill testified DM Financial was not doing business as (a "DBA") appellation for VanDyk, and that VanDyk did not allow DBAs in the state of California due to state regulation on DBAs.  Pls.' Hill Dep. at 135:6-14.

## C.     Steve Thieme

Thieme met Cobb in 2003 or 2004.  Thieme UMF 16.  He refinanced his home in 2006 using Cobb's services when she was with DM Financial.  Thieme UMF No. 18.  Thieme also refinanced his home with VanDyk in 2010.  Thieme Dep. at 32:2-13.  Thieme's partner, Dawn Perry, told him about investments she had made with Cobb.  Thieme UMF 21.  At Perry's suggestion, Cobb sent Thieme information about the bridge loan investments; Thieme believes the information was on DM Financial letterhead.  Thieme UMF 23.  Thieme did not correspond with Cobb using her VanDyk email address.  Thieme UMF 25.  Thieme decided to invest in the bridge loans in February or March 2011.  Thieme UMF 23.  In 2011 and again in 2012, Thieme made checks payable to DM Financial, and sent them to the address for DM Financial that Cobb had provided.  Thieme UMF 26, 28, 37-39.  Thieme never wrote a check to VanDyk.  Thieme UMF 29.  He understood he would be receiving interest payments from DM Financial.  Thieme UMF 35.  Before filing this lawsuit, Thieme never visited VanDyk's offices, received any

United States District Court
Northern District of California

8

documentation with VanDyk letterhead regarding the bridge loans, visited VanDyk's website, or saw any advertisements for VanDyk.  Thieme UMF 27, 33, 34.

**D.      Cynthia Chenault**

Chenault's husband met Davis in 1993 or 1994.  Chenault UMF 17.  Chenault first heard of Cobb from Davis twenty years ago.  Chenault UMF 28.  Chenault understood Davis had a company called DM Financial in which Davis and Cobb were partners.  Chenault UMF 19, 30, 35.  Chenault contacted Davis after her mother died in 2008 because she wanted to invest her inheritance.  Chenault UMF 21.  Davis spoke to Chenault about investing in a bridge loan.  Chenault UMF 21.  Between 2008 and 2010, Chenault wrote checks payable to DM Financial totaling $124,000; she never wrote a check to VanDyk.  Chenault UMF 39-44.  Chenault received "5 or 600 dollars a month" in return from DM Financial; she never received any checks from VanDyk.  Chenault UMF 24, 25.  Chenault invested with Davis "based on [her] longtime friendship with him."  Chenault UMF 35.  She never spoke with Davis about VanDyk.  Chenault UMF 27.  Davis never told Chenault he worked for VanDyk; Chenault does not recall if Cobb ever told her she worked for VanDyk.  Chenault UMF 34.  In fact, Chenault could not recall when she had heard the name VanDyk.  Chenault UMF 36.  Between 2008 and 2012, Chenault did not visit VanDyk's website.  Chenault UMF 37.  With the exception of postcards "talking about investing," Chenault did not receive materials from VanDyk.  Chenault UMF 37, 38.  Chenault never refinanced or obtained a mortgage with VanDyk.  Chenault UMF 31.

**E.      Lewis Haynes**

Haynes met Davis in December 2003.  Haynes UMF 17.  Haynes understood Davis worked with DM Financial.  Haynes UMF 18, 40.  In 2005, Haynes decided to invest with Davis and DM Financial after Davis suggested he invest in bridge loans.  Haynes UMF 23.  Haynes understood that he and Davis' mother would "provide funds for [Davis] to make bridge loans to help entice people to buy his services."  *Id.*  In March 2005, Davis sent Haynes a memorandum of understanding regarding the bridge loan investment that was printed was on DM Financial letterhead.  Haynes UMF 27, 42.  Haynes understood he was making an investment with DM Financial.  Haynes UMF 28, 30.  The check Haynes wrote to invest in the bridge loans was not

United States District Court
Northern District of California

1    made out for payment to VanDyk.  Haynes UMF 38.

2          Haynes met Cobb "sometime in 2005, after Mr. Davis and I agreed to my investment of

3    money into [DM Financial.]"  Haynes UMF 23.  Haynes believed Cobb worked with Davis at DM

4    Financial.  Haynes UMF 25.  Haynes had not heard of VanDyk until 2006 or 2007—after he

5    invested in the bridge loans with DM Financial.  Haynes UMF 21, 33.  Prior to investing in the

6    bridge loans, Haynes had not visited VanDyk's website, received documents from a VanDyk

7    email address or on VanDyk letterhead, or seen any VanDyk advertisements.  Haynes UMF 34-35.

8    Although Haynes never received information from Cobb on VanDyk letterhead or stationary, he

9    communicated with Cobb about the status of the bridge loans while Cobb was a VanDyk agent.

10   Haynes UMF 36;Pls.' Opp'n to Haynes UMF 36.  VanDyk states in its Motion that "VanDyk

11   facilitated the refinance of [Plaintiff's] home" (Haynes Mot. at 11) at some point, but neither party

12   offers evidence establishing this refinance occurred, or when.

13                                    **LEGAL STANDARD**

14         Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

15   that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

16   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

17   bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

18   demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

19   317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.*

20   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

21   sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

22         Where the moving party will have the burden of proof on an issue at trial, it must

23   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

24   party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

25   the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

26   pointing out to the district court that there is an absence of evidence to support the nonmoving

27   party's case.  *Celotex*, 477 U.S. at 324-25.

28         If the moving party meets its initial burden, the opposing party must then set forth specific

United States District Court
Northern District of California

10

facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."  *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).  Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law."  *Celotex*, 477 U.S. at 322 (internal quotations omitted).

Additionally, at the summary judgment stage, parties must set out facts they will be able to prove at trial.  At this stage, courts "do not focus on the admissibility of the evidence's form . . . . [but] instead focus on the admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citation omitted).  "While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence."  *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citations omitted).  Accordingly, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Celotex*, 477 U.S. at 324 (a party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

## DISCUSSION

VanDyk moves for summary judgment on Plaintiffs' negligence claim on the ground it did

not owe them any duty of care.  VanDyk also moves for summary judgment on their UCL claims on the grounds Plaintiffs suffered no injuries as a result of VanDyk's conduct, and VanDyk did not receive any money from Plaintiffs.

**A.    Negligence**

      1.    <u>Plaintiffs' Claims</u>

      Plaintiffs' negligence claims are premised on VanDyk's failure to adequately investigate Cobb's background and qualifications before hiring her and failure to supervise Cobb's loan origination and lending activities.  *See* Thieme Third Am. Compl., Seventh Cause of Action. These failures, Plaintiffs contend, violate a host of duties imposed by federal and state law, industry practice, and VanDyk's internal procedures.  *See id.*; *see also* Thieme Opp'n at 2-3 (arguing VanDyk committed (1) negligence per se through the violation of federal and state laws; (2) professional negligence by violating standards of care and codes of ethics applicable to the mortgage lending industry; and (3) ordinary negligence by violating its own internal rules and mandates).  In brief, Plaintiffs allege that VanDyk knew or could have learned that Cobb continued to work with Davis after she joined VanDyk, and that Cobb was using the name and reputation of VanDyk "to continue [her] prior activity of arranging bridge loans in such a way as to enhance the legitimacy of her bridge loan activities."  Thieme Third Am. Compl. ¶ 136.  They further allege VanDyk allowed DM Financial to operate as "an alternative name or brand for VanDyk" (*id.*) and knew Cobb was using VanDyk's resources "to promote her bridge loan activities as a means to develop borrowers for [VanDyk's] first mortgage[s]" (*id.* ¶ 137).  They allege VanDyk created a situation "in which it was eminently foreseeable that misappropriation of Plaintiff funds could, would, and did, occur."  *Id.* ¶ 139.  If VanDyk had fulfilled its duties, Plaintiffs allege it would have discovered Cobb's fraud, reported Cobb to the appropriate authorities, and prevented Plaintiffs' damages.  *Id.* ¶ 142.

      To prevail on their negligence claims against VanDyk, Plaintiffs must show VanDyk had a legal duty to use reasonable care; that VanDyk breached that duty; and that the breach was the proximate cause of Plaintiffs' injuries.  *See Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998).  A duty "may be imposed by law, be assumed by the defendant, or exist by

United States District Court
Northern District of California

virtue of a special relationship." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984-85 (1993).  VanDyk argues it did not owe Plaintiffs a duty of care because they were not in privity with VanDyk with respect to the bridge loans.  Plaintiffs respond VanDyk owed them a duty for two reasons: first, because Plaintiffs are the third-party beneficiaries of protections imposed by law and contract and second, because California law creates a common law duty of care.

### 2.   Third-Party Beneficiary Theory of Duty

Plaintiffs argue the duties imposed by applicable law and the standards and policies with respect to VanDyk's lending activities "are so broadly construed or implicitly inherent as to be owed to the public in general, or to the particular public, e.g., borrowers and investors, inter alia, who are in contact with or affected by the industry that the statutes and regulations seek to govern." *Id* at 8.  They also contend they are third party beneficiaries to Cobb's employment contract with VanDyk.  *Id*.  The Court rejects both arguments.

#### a.   Statutes, Regulations, Policies, etc.

None of the cases Plaintiffs cite support their argument that dozens federal or state statutes, policies, or regulations impose a duty of care on a private employer for the financial well-being of third parties.  *See* Opp'n at 8-10.  Each of these cases addresses the power of a regulatory body to protect the public by enforcing its rules without needing to show intent on the part of violators. *See id*.  Plaintiffs are not regulatory bodies and are not empowered to enforce the rules of regulatory bodies; these cases are completely inapposite.

After a Pacific Gas & Electric ("PG&E") gas pipeline exploded in 2010, the California Public Utilities Commission ("PUC") imposed reforms on PG&E.  *See Pacific Gas & Elec. Co. v. P.U.C.*, 237 Cal. App. 4th 812 (2015).  PG&E subsequently discovered some of the information it had provided to PUC regarding other pipelines might not be correct and submitted an errata correcting its previous filings.  *Id*. at 819.  "Pursuant to its statutory authority to adopt 'rules of practice and procedure' . . . the [PUC] promulgated rule 1.1, which provides in pertinent part: 'Any person who . . . transacts business with the [PUC] agrees never to mislead the [PUC] or its staff by an artifice or false statement of fact or law.'"  *Id*.  The PUC held PG&E violated rule 1.1 and imposed a $14.35 million civil penalty.  *Id*.  PG&E appealed.  In affirming the penalty, the

1   Court of Appeal held the PUC's jurisdiction to impose monetary sanctions as a deterrent to ensure

2   compliance with its "unquestionably valid jurisdictional power." *Id*. at 846.  The Court of Appeal

3   concluded the PUC could find PG&E had violated Rule 1.1 without finding PG&E had a mental

4   state to mislead, holding this

> approach has found wide acceptance when construing statutes
> intended to protect the public, even when noncompliance is treated
> as a misdemeanor . . . .  It is only when the violation elevates to
> felony, and is accompanied by harsher consequences, that an intent
> element is implied.  As no misdemeanor or felony prosecution
> confronts PG&E, we conclude the public protection approach
> furnishes a more useful and reliable analogue than one aspect of
> statutory tort law.  The [PUC] is not concerned with redressing a
> private wrong to an individual, but with protecting the safety of the
> general public–not to mention the integrity of the statewide
> regulatory authority exercised by the Commission.

11   *Id*. at 847.  Unlike the PUC, Plaintiffs are not vested with regulatory authority nor entrusted with

12   protecting the safety of the general public, and these are not regulatory proceedings.

13       *Khan v. Medical Board of California*, 12 Cal. App. 4th 1834 (1993), is similarly

14   inapposite.  In *Khan*, the Court of Appeal affirmed the Medical Board's revocation of a

15   physician's approval to supervise assistants and revoked the physician's certificate.  The "manifest

16   object" of the statute the physician allegedly violated was "the protection of the public from

17   certain forms of treatment by unlicensed, and presumably unqualified persons" and evidenced the

18   Legislature's determination that one way to provide protection to the public was to require

19   licensed physicians to only employ other licensed persons.  *Id*. at 1844.  The statute empowered

20   the Division of Medical Quality to regulate medical practitioners and to take action against a

21   licensee for unprofessional conduct, including employing an unlicensed person to engage in the

22   practice of medicine.  *Id*.; *see also Sternberg v. Cal. State Bd. of Pharmacy*, 239 Cal. App. 4th

23   1159 (pharmacist need not have knowledge of violation for board to discipline him).

24       Like *Pacific Gas & Electric*, *Khan* and *Sternberg* examine statutes that empower

25   regulatory bodies to enforce consumer protection statutes through their own rule-making and

26   enforcement mechanisms.  These cases do not suggest that VanDyk owed Plaintiffs, as private

27   parties asserting a negligence claim, a legal duty purely based on the existence of mortgage laws

28   meant to protect the public.  Plaintiffs have failed to offer any argument that they are empowered

to enforce any of the laws, policies, or regulations they have identified.

### b.      Third-party Beneficiaries to Contract

Plaintiffs also do not cite any cases or evidence to support their contention they are third-party beneficiaries to Cobb's employment contract with VanDyk.  Moreover, none of the cases Plaintiffs cite suggest that, without more, an employer owes a third-party beneficiary to a contract a legal duty under a negligence theory.

In *Northstar Financial Advisers. Inc. v. Schwab* Inve*stments*, 779 F.3d 1036, 1062-63 (9th Cir. 2015), the Ninth Circuit explained that the critical issue in determining whether a third-party could bring a breach of contract claim was whether the third party was an intended beneficiary of the contract based on the intention of the parties.  The court found the plaintiffs had sufficiently alleged that they were the intended beneficiaries of the contract at issue, and reversed the district court's order dismissing the third party beneficiary breach of contract claims:  "Under California law, . . .  a party may be a third-party beneficiary to a contract if he alleges that he is a member of a class named or referred to in the contract, or if the contract discharges a contractual duty owed to the plaintiff."  *Id*. at 1065.  *Lucas v. Hamm*, 56 Cal.2d 583, 589 (1961) also involved third-party beneficiary claims for breach of contract, and does not suggest that third parties can—without more—maintain a negligence claim against an employer.  Instead, the *Lucas* Court found that "one of the main purposes which the transaction between defendant and the testator intended to accomplish was to provide for the transfer of property to plaintiffs; the damage to plaintiffs in the event of invalidity of the bequest was clearly foreseeable . . . ."  *Id*. at 589.  In *Garratt v. Baker*, 5 Cal. 2d 745 (Cal. 1936), three married business partners entered into a contract in which they agreed that in the event of the death of any one of them, the survivors would pay the widow of the third $500 per month until her death.  When one partner died, the other two made payments for some time, then stopped.  The widow sued.  The California Supreme Court reversed the order sustaining defendants' demurrer, finding the agreement met all the requirements for a third-party beneficiary: it "was expressly for the benefit of one of the three possible surviving widows, and it was not necessary that the beneficiary be named and identified as an individual.  A third party may enforce a contract where he shows that he is a member of a class of persons for whose benefit it

15

United States District Court
Northern District of California

was made." *Id.* at 748.

But Plaintiffs do not bring a third-party beneficiary breach of contract claim, they bring a negligence claim. Even if they did bring a third-party beneficiary breach of contract claim, they have not demonstrated they were intended third-party beneficiaries of Cobb's employment contract with VanDyk. *Northstar*, *Lucas*, and *Garratt* are thus inapposite.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 57 (1998) (internal quotation marks and citations omitted). While statutes, rules, regulations, best practices, or employment contracts all may be relevant to show VanDyk's conduct fell below an acceptable standard of care, they do not establish VanDyk owed Plaintiffs a duty for purposes of their negligence claim against VanDyk. *See Wawanesa Mut. Ins. Co. v. Matlock*, 60 Cal. App. 4th 583, 586 (1997) ("Just because a statute has been violated does not mean that the violator is necessarily liable for any damage that might be ultimately traced back to the violation. . . . The doctrine of negligence per se does not apply even though a statute is violated if the plaintiff was not in the class of persons designed to be protected or the type of harm which occurred was not one which the statutes was designed to prevent. Mere 'but for' causation . . . is simply not enough.") (internal quotation marks and citations omitted); *see also California Serv. Station & Auto. Repair Ass'n v. Am. Home Assur. Co.*, 62 Cal. App. 4th 1166, 1178-80 (1998) ("[W]e conclude the Evidence Code section 669 presumption of negligence applies only after determining that the defendant owes the plaintiff an independent duty of care[.]").

### 3. Common Law Duty of Care

Plaintiffs argue that VanDyk also owes them a common law duty of care under the factors applicable under California law. *See* Opp'n at 10-13.–

#### a. *Biakanja/Rowland Factors*

"In the employment context, an employer may be held directly liable for the behavior of an unfit employee where the employer was negligent in the hiring, training, supervising, or retaining of that employee." *Delfino v. Agilent Tech., Inc.*, 145 Cal. App. 4th 790, 815 (2006). "Negligence

liability will be imposed upon the employer if it knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." *Id.*  As the California Supreme Court has recognized, "a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law." *Quelimane*, 19 Cal. 4th at 58.  Courts must balance several factors to assess the existence of a legal duty where, as here, third parties seek to hold an employer liable for the economically destructive acts of its representative.  *See Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1196-97 (9th Cir. 2001) (citing *Biakanja v. Irving*, 49 Cal.2d 647, 650 (1958)).

The *Biakanja* factors are: (1) the foreseeability of harm to plaintiff; (2) the degree of certainty that the plaintiff suffered injury; (3) the closeness of the connection between defendant's conduct and the injury suffered; (4) the moral blame attached to defendant's conduct; and (5) the policy of preventing future harm.  49 Cal. 2d at 650.  The California Supreme Court added several factors to this list in *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968): (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) the availability, costs, and prevalence of insurance for the risk involved.  Although the existence of a duty of due care is a question of law, the foreseeability of risk of harm is a question of fact for the jury.  *See Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 46 (1975).

### b. Application

The Court now evaluates each of the *Biakanja/Rowland* factors:

*Foreseeability of harm to Plaintiffs*.  Plaintiffs argue that laws prohibiting dual employment by a mortgage lender and its employees in the fields of real estate and banking "lead to the inescapable conclusion that harmful conflict of interest and related wrongdoing, such as fraud and identity theft, have been and are seen as sins to be avoided, that is . . . 'foreseeable.' Otherwise, why pass the law and write the proscription against dual employment and office sharing." Opp'n at 11.  This misstates the approach courts take to analyze whether a legal duty exists.  "Under the duty approach [to negligence], conduct is negligent when it creates an unreasonable risk of harm to some *general class of persons*.  If the plaintiff is not within that class

toward whom the defendant is negligent, the injury does not give rise to liability." *Jackson v. Ryder Truck Rental, Inc.*, 16 Cal. App. 4th 1830, 1837 (1993) (citation omitted, emphasis in original). "In deciding the question of foreseeability in the context of legal duty, a court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." *Id.* at 1839 (internal quotations omitted; emphasis in original) (citing *Ballard v. Uribe*, 41 Cal. 3d 564, 573 n.6 (1986)); *see also Jefferson v. Qwik Korner Market, Inc.*, 28 Cal. App. 4th 990, 996 (1994) ("An act must be *sufficiently likely* before it may be foreseeable in the legal sense. That does not mean simply imaginable or conceivable. Given enough imagination, *everything* is foreseeable." (emphasis in original)).

Cobb testified that she never told VanDyk that she would continue to sell bridge loans after being hired; however, she told VanDyk management at least twice that she was planning to keep on working on real estate matters through DM Financial. Cobb and VanDyk management discussed the fact she was prohibited from dual employment, but VanDyk management told Cobb not to worry about the policy. Cobb also testified she submitted mortgage applications for certain bridge loan clients to VanDyk's Underwriting Department, and that those applications listed investments with DM Financial. VanDyk "scrupulously" reviewed all mortgage applications, and therefore should have seen DM Financial listed. Cobb had listed DM Financial as her prior employer, and VanDyk subleased space from DM Financial for Cobb's branch. Cobb operated VanDyk's business in the same location in which DM Financial operated; both VanDyk and DM Financial were displayed on the office's front door. Cobb's Mill Valley office was flagged by VanDyk as being at risk for improper office sharing. There is no evidence VanDyk knew Cobb was engaged in the bridge loan scheme after she joined VanDyk; nonetheless, with these facts, a reasonable jury could find that VanDyk knew or should have known that Cobb was violating VanDyk's policies and conducting another real-estate business through DM Financial, and that some of VanDyk's mortgage clients also purchased products through DM Financial. A reasonable

jury could also find that dual employment and/or office sharing would expose VanDyk clients to fraud and negligence by a VanDyk employee.  Thus, the Court finds the "class of persons" to be protected would include VanDyk clients; and the category of conduct at issue would reasonably include using fraud or negligence by a VanDyk employee that was facilitated by virtue of dual employment and/or office sharing.

But VanDyk has met its burden of showing there is no evidence that Chenault or Haynes were VanDyk's clients when they invested in the bridge loans with DM Financial.  VanDyk established (1) Chenault never obtained a mortgage or refinanced any loans through VanDyk but invested in bridge loans through DM Financial and Davis; and (2) Haynes invested in the bridge loans with DM Financial and Davis before meeting Cobb, and did so years before Cobb joined VanDyk.  Plaintiffs fail to rebut that showing and fail to create a triable issue of fact that Chenault and Davis were VanDyk's clients when they invested in the bridge loans, or that they invested in the bridge loans because of Cobb's association with VanDyk.[6]  Plaintiffs cite a decision by the Marin County Superior Court in *Scott v. Cobb*, a case filed by other defrauded bridge loan investors.  *See* Opp'n at 11 (citing Fraser Decl., Ex. A at 6-8, Dkt. No. 179).  The *Scott v. Cobb* decision does not have precedential value in this case, and the point for which Plaintiffs cite the decision is not relevant to their argument that VanDyk owed these three Plaintiffs a duty of care.  *See id.*[7]  Finally, Plaintiffs argue that Cobb's employment contract with VanDyk "specifically

---

[6] Plaintiffs argue evidence "shows that about 75% of bridge loan investors also had loans with VanDyk during [Cobb's] tenure."  Opp'n at 11 (citing Cobb Dep. Vol. 1 at 57:9-58:11).  The deposition passage Plaintiffs cite does not support their argument.  In the passage cited by Plaintiffs, Cobb testified that 99.999% of loans she originated in 2006 – before she joined VanDyk – were first mortgage loans, and "a hundredth of a percent" were bridge loans.  It appears Plaintiffs intended to cite Cobb Dep. Vol. 1 at 168:13-21, which does support their point.  In any event, neither passage establishes that *Plaintiffs* had loans with VanDyk.  Plaintiffs further argue the names of Haynes and Chenault, "and perhaps Thieme were on VanDyk's computer systems when they took over DM Financial."  *Id.* (citing Cobb Dep. Vol. 1 at 160:2-25).  The evidence they cite does not create a triable issue that they were VanDyk clients, as opposed to clients of Cobb, who input their names in VanDyk's computers for future solicitation.  *See id.* (testifying the name of the clients Cobb had done starting in 2000 were input in VanDyk's systems in 2007, but not testifying that Haynes, Chenault, or Thieme were clients).

[7] The *Scott* decision in fact demonstrates how VanDyk's liability must turn on the facts of each individual case.  For example, the *Scott* decision notes that VanDyk offered no undisputed facts to negate plaintiff's allegation in that case that Cobb solicited her for a first-mortgage refinance by VanDyk, and that another plaintiff was under the impression DM Financial and VanDyk were

19

directed [her] to obtain[] clients for VanDyk" and that she was supposed "to spend a majority of her time locating and developing clientele for VanDyk." Opp'n at 11 (citing Pls.' Consol. Evid. Ex. 31 at 158).  But there is no evidence Cobb obtained business from Chenault or Haynes for VanDyk, at least not before they invested in the bridge loans.  Based on the evidence on summary judgment, no reasonable jury could find that the risk of harm to Haynes or Chenault was foreseeable to VanDyk.

The Court's analysis is different for Thieme.  VanDyk has not met its burden of production to establish Thieme was not a client when he invested in the bridge loans with Cobb.  A reasonable jury could therefore find the risk of harm to Thieme was foreseeable.

*Degree of certainty that Plaintiffs suffered injury*.  It is undisputed that Plaintiffs suffered financial losses as a result of investing with Cobb, Davis, and DM Financial.

*Closeness of the connection between VanDyk's conduct and the injury*.  VanDyk has met its burden of showing there is no evidence that its acts or omissions caused Plaintiffs to invest in the bridge loans.  VanDyk's alleged failure to screen Cobb or supervise her simply had no effect on Haynes or Chenault's decision to invest with Davis and DM Financial.  Haynes invested in the bridge loans years before Cobb joined VanDyk, and did so because of his relationship with Davis; but there is no evidence Haynes invested in the bridge loans because of a relationship with Cobb, or because of Cobb's association with VanDyk.  Chenault had known Davis for years and chose to invest funds with him; there is no evidence she invested in the bridge loans because of a relationship with Cobb, or because of Cobb's association with VanDyk.

Thieme met Cobb in 2006 and refinanced his home through DM Financial.  Unlike Haynes and Chenault, Cobb introduced Thieme to the bridge loan scheme.  Thieme invested in the bridge loans when Cobb was employed by VanDyk and after Thieme became a VanDyk client.  Nevertheless, there is no evidence Thieme invested in the bridge loans because of VanDyk or Cobb's affiliation with VanDyk.  There is no evidence VanDyk promoted the bridge loan scheme or facilitated Plaintiffs' investment therein.  Plaintiffs all understood Davis and Cobb worked with

---

"one and the same" because VanDyk was doing her refi and Cobb was doing the bridge loan, and Cobb worked for VanDyk.

United States District Court
Northern District of California

1    DM Financial, believed the bridge loans were sold by DM Financial, and made their payments for

2    the bridge loans to DM Financial.  Plaintiffs testified they did not correspond with Cobb at her

3    VanDyk email address and did not receive information relating to the bridge loans from VanDyk.

4            Plaintiffs argue that VanDyk's failure to supervise or investigate dual employment and

5    prohibited branch sharing "make it clear that there was and would continue to be a direct

6    connection between the failure to act of VanDyk and the continuing injury to [P]laintiffs."  Opp'n

7    at 12.  This is not "clear" at all.  To the extent Plaintiffs argue that VanDyk could have prevented

8    some of their losses by supervising Cobb more closely, they fail to clearly articulate that theory or

9    offer any evidence to support it.  First, there is no evidence that greater supervision would have led

10   VanDyk to discover the fraud.  The fraud was sufficiently discrete that Tony Cobb had "no

11   inkling" that Cobb was taking money from clients for bridge loans despite the fact he worked with

12   her daily.  Haynes UMF 6.  While Plaintiffs argue VanDyk had the authority to supervise Cobb's

13   calls and read her emails, Cobb communicated with DM Financial clients on a separate DM

14   Financial phone line and with a separate @DMfinancial email address.  Plaintiffs offer no

15   evidence VanDyk had the authority and ability to monitor on the DM Financial phone line or

16   email.  Second, there is no evidence that discovery of the improper office sharing or dual

17   employment would have caused DM Financial to cease operating, as opposed to simply shutting

18   down the VanDyk branch out of which Cobb worked.  Given that Haynes and Chenault invested

19   in the bridge loans as a result of their relationship with Davis and DM Financial, there is no

20   evidence that VanDyk severing its relationship with Cobb would have affected Haynes or

21   Chenault in any way.  Finally, to the extent Plaintiffs imply VanDyk's discovery of the fraud

22   would have enabled them to recover some of the funds they invested, there is no evidence that

23   Plaintiffs would have been able to recover their investments in whole or in part at any point after

24   they made their initial bridge loan investments.

25           Based on the evidence presented on summary judgment, the Court finds VanDyk's acts or

26   omissions were not closely related to these particular Plaintiffs' injuries.

27           *Moral blame attached to defendant's conduct*.  Plaintiffs identify numerous laws,

28   regulations, best practices, and internal VanDyk policies they allege VanDyk failed to follow, and

United States District Court
Northern District of California

21

argue VanDyk's failures are morally reprehensible.  *See* Opp'n at 12.  But the Court already found there is no evidence that any negligent hiring or failure to supervise on VanDyk part was closely connected to Plaintiffs' injuries.  Moreover, in evaluating the moral blame attached to a defendant's conduct, courts do not look to "the moral blame that attends ordinary negligence" but look for "a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result; (2) had actual or constructive knowledge of the harmful consequences of their behavior; (3) acted in bad faith or with a reckless indifference to the results of their conduct; or (4) engaged in inherently harmful acts."  *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 270 (1998) (internal citations omitted).  There is no evidence VanDyk intended or planned the result; had actual or constructive knowledge that its failure to supervise created harmful consequences; or engaged in inherently harmful acts.  There is evidence that VanDyk acted with reckless indifference by failing to supervise Cobb according to its own policies; failing to follow-up on the report of possible improper office sharing in 2010; and allowing Cobb to continue working for DM Financial after she joined VanDyk despite VanDyk's prohibition on dual employment.  But on balance, and because there is no evidence VanDyk's failures were closely connected to Plaintiffs' injuries, the Court finds this factor weighs against a finding of duty.

*Policy of preventing future harm*.  Because the Court found there was no evidence that VanDyk's negligent hiring or supervision was closely connected to these Plaintiff's injuries, the policy of preventing the type of future harm at issue here does not weigh in favor of finding a duty.  "It would be a dubious proposition indeed to suggest that a party, simply by virtue of engaging in business, owes a duty to the world for all acts taken by its employee, irrespective of whether those actions were connected with the enterprise in which the business was engaged."  *Delfino*, 145 Cal. App. 4th at 816.

*Burden to VanDyk and consequences to the community*.  Plaintiffs identify actions VanDyk should have taken to screen potential hires and to better supervise employees, and the modest financial burden this would have imposed on VanDyk.  *See* Opp'n at 13.  But because the Court found no evidence that VanDyk's negligent hiring or supervision was closely connected to Plaintiff's injuries, the burden to VanDyk and consequences to the community do not weigh in

United States District Court
Northern District of California

1  favor of finding a duty.

2      *Insurance*.  The fact VanDyk only carried the minimal required $300,000 insurance and

3  could have purchased additional insurance weighs slightly in favor of finding a duty.

4          c.    *Summary of Factors*

5      "[A] duty to manage business affairs so as to prevent purely economic loss to third parties

6  in their financial transactions is the exception, not the rule, in negligence law."  *Quelimane*, 19

7  Cal. 4th at 58.  California courts have established a rule against potentially unlimited liability for

8  economically destructive acts of a representative of an entity to third parties; "[a]s a matter of

9  economic and social policy, third parties should be encouraged to rely on their own prudence,

10 diligence, and contracting power, as well as other informational tools."  *Bily v. Arthur Young &*

11 *Co.*, 3 Cal. 4th 370, 403 (1992).  VanDyk could not foresee that hiring Cobb could create a risk to

12 non-clients such as Haynes and Chenault; VanDyk certainly could not foresee that hiring Cobb in

13 2007 would injure Haynes for an investment made several years earlier with Davis.  Moreover,

14 there is no evidence that anything VanDyk did or failed to do caused any of these Plaintiffs to

15 invest in the bridge loan scheme or to be injured.  Because there is evidence Thieme was a

16 VanDyk client at the time he invested in the bridge loans, the question of duty is a closer one for

17 him.  Nonetheless the absence of evidence that VanDyk's actions or inactions were closely

18 connected to any of the Plaintiffs' injuries weighs against imposing a duty on VanDyk in this case.

19 After weighing the *Rowland* and *Biakanja* factors, the Court concludes that imposing a duty of

20 care on VanDyk under the circumstances of these cases would go against California policy.[8]

21 **B.    UCL**

22     Private parties seeking redress under California's Unfair Competition Law must establish

23 they suffered an economic injury as a result of the unfair business practice or false advertising that

24 is the gravamen of the claim.  *See Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322 (2011).

25 _____

26 [8] The Court notes that the evidence on summary judgment differs materially from the allegations
   in the operative complaint that led the undersigned to deny VanDyk's motion to dismiss.  *See, e.g.*,
27 Order Denying Mot. to Dismiss at 8-9, *Thieme* Dkt. No. 101 (Plaintiffs alleged they had direct
   business dealings with VanDyk; terms of Cobb's employment agreement provided she was
28 encouraged to keep originating bridge loans underwritten by VanDyk; VanDyk and DM Financial
   were interchangeable).

The UCL limits the available remedies available to Plaintiffs to restitution and injunctive relief. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1149 (2003).  Restitution only pertains to money or property a defendant acquired through unlawful means.  *See id.*; *see also Shersher v. Super. Ct.*, 154 Cal. App. 4th 1491, 1500 (2007); *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1016 (2005).

VanDyk argues it is entitled to summary judgment on Plaintiffs' UCL claim because Plaintiffs did not suffer any injury as a result of VanDyk's conduct.  *See* Mot. at 17-18.  VanDyk also argues that Plaintiffs are not able to recover under their UCL claim because there is no evidence VanDyk acquired monies from Plaintiffs.  *Id.* at 18-19.  Instead of responding to VanDyk's arguments, Plaintiffs merely argue in the Conclusion of their Opposition that they "have presented evidence of enough applicable statutes, regulations, . . . to permit a trial on the issue of violation of those statutes by the defendant to go forward."  Opp'n at 16.  Generously construing their Opposition, it appears that Plaintiffs argue that VanDyk is liable under the UCL because VanDyk and DM Financial were alter egos.  *See* Opp'n at 6.  The Court first examines Plaintiffs' presumptive alter ego theory then turns to VanDyk's arguments.

### 1.   Alter Ego Liability

VanDyk has met its burden of producing evidence that it and DM Financial were separate entities:  Hill testified DM Financial was not a DBA for VanDyk and that VanDyk did not allow DBAs in California; DM Financial operated between 2001 and 2012 and consisted of two partners, Cobb and Davis, and also of Tony Cobb, while VanDyk is a licensed mortgage broker operating in 37 states; Cobb joined VanDyk in 2007 as a branch manager, loan officer, outside sales representative and loan processor; VanDyk sold first and second mortgages and did not sell bridge loans; DM Financial sold bridge loans to investors before Cobb became associated with VanDyk; Davis never worked for VanDyk; not all bridge loan investors had VanDyk mortgages; Plaintiffs understood they were investing in bridge loans with DM Financial; and Plaintiffs wrote checks to DM Financial, not VanDyk.  *See supra* at 6-10.  VanDyk has thus identified evidence showing that it and DM Financial were different legal entities.  The burden shifts to Plaintiffs to create a triable issue of fact that VanDyk and DM Financial were alter egos.

"There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case." *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985) (internal citations and quotation marks omitted). "There are, nevertheless, two general requirements:  (1) that there be such unity of interest and ownership that the separate personalities of the corporation[s . . .] no longer exist and (2) that, if the acts are treated as those of [one] corporation alone, an inequitable result will follow."  *Id.*  California courts look to a number of factors when evaluating unity of interest and ownership, including

> [c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses . . .; the treatment by an individual of the assets of the corporation as his own . . .; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . .; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family . . .; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . .; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . .; the use of the corporate entity to procure labor, services or merchandise for another person or entity . . .; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another[.]

*Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811-12 (2010).  "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine."  *Id.* at 812.

Plaintiffs argue VanDyk

> used DM Financial as a virtual DBA without securing the permission of the California regulatory authorities or filing a Fictitious Name Statement.  In so doing, it knowingly co-opted the physical office, the equipment, the advertising of DM Financial, the office staff of DM Financial, the mailing list of DM Financial, the computers and telephone of DM Financial, and the leads of contact of DM Financial throughout the term of Diane Cobb.  For all intents and purposes it 'took over' DM Financial . . . in actual fact, it became DM Financial, and such was the perception of the plaintiffs herein to the degree that they thought about the matter.

United States District Court
Northern District of California

Opp'n at 6.  Assuming *arguendo* such facts would be sufficient to establish alter ego liability, Plaintiffs have not identified any evidence to establish a triable issue of fact exists as to the majority of these facts.  Instead of citing evidence that demonstrates VanDyk and DM Financial are alter egos, Plaintiffs cite "See Evidence generally, as outlined in long form below."  *Id.*  The "long form" is almost a full page list of citations to 18 exhibits, and several dozens of passages therein; while Plaintiffs identify the exhibits being cited (e.g., deposition of Corey Hill), the vast majority of the citations are not explained by parentheticals.  *See id.*  The "long form" appears to be evidence in support of Plaintiffs' entire Opposition rather than evidence supporting Plaintiffs' alter ego theory.  This approach is insufficient to defeat summary judgment because Plaintiff does not set forth the evidence that precludes summary judgment "with reasonable particularity" (*Keenan*, 91 F.3d at 1279), or provide "adequate references so that [the evidence] could conveniently be found" (*Carmen*, 237 F.3d at 1031).  "[A] district court has no independent duty 'to scour the record in search of a genuine issue of triable fact,'" and "[i]s under no obligation to undertake a cumbersome review of the record on [Plaintiffs'] behalf."  *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting *Keenan*, 91 F.3d at 1279).

Moreover, the Court reviewed the evidence cited by Plaintiffs and finds it establishes that VanDyk subleased space from DM Financial using formal leasing documents; VanDyk used DM Financial's equipment during a transition period after Cobb joined them; and several individuals who worked for DM Financial also worked for VanDyk, receiving separate paychecks from each of those entities.  *See supra* at 6-8.  But there is no evidence that VanDyk and DM Financial commingled funds, failed to observe corporate formalities, had common ownership or management, diverted or manipulated assets, or demonstrated any of the other factors California courts consider in evaluating alter ego liability.  *Cf. Zoran*, 185 Cal. App. 4th at 811-12.  Plaintiffs have not met their burden of showing a genuine issue of fact exists that DM Financial and VanDyk were alter egos.

### 2.   Causation

The Court already found Plaintiffs failed to create a triable issue of fact that anything VanDyk did or did not do caused them to invest in bridge loans.  *See supra* at 8-10, 20-21.  To the

extent Plaintiffs argue VanDyk's negligent hiring or supervision contributed to their injuries, the Court already found they failed to articulate the argument or identify evidence that would support it.  Thus, Plaintiffs have failed to demonstrate a triable issue of fact exists whether they were injured as a result of VanDyk's conduct.

3.     Restitution

As discussed above, VanDyk identifies evidence demonstrating Plaintiffs made all payments for the bridge loans to DM Financial, and not to VanDyk.  VanDyk accordingly has met its burden of showing there is no evidence it acquired money or property from Plaintiffs. Plaintiffs have not identified any evidence creating a triable question of fact that VanDyk received or otherwise benefited from the funds Plaintiffs seek to recover here.

4.     Summary

Because VanDyk has met its burden of demonstrating that (1) Plaintiffs did not lose money or property as a result of VanDyk's conduct, and (2) VanDyk did not receive the funds Plaintiffs seek to recover in this action, the Court grants summary judgment to VanDyk on Plaintiff's UCL claims.

## CONCLUSION

Based on the analysis above, the Court hereby **GRANTS** VanDyk's Motions for Summary Judgment as to the negligence and UCL claims brought by Thieme, Chenault and Haynes.

The Court will enter a separate judgment in favor of VanDyk and against Plaintiffs in each of the three related actions.

**IT IS SO ORDERED.**

Dated: February 14, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge

United States District Court
Northern District of California

27